**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| Seth Steidinger and Natasha Koller, *on behalf of themselves and all others similarly situated,* : <br><br> Plaintiff, :<br><br> v. :<br><br> Blackstone Medical Services, LLC, :<br><br> Defendant. : | Case No. 1:24-cv-01074-JBM-JEH |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINTAND TO STRIKE DEMAND FOR ATTORNEYS' FEES**

Plaintiffs Seth Steidinger ("Steidinger") and Natasha Koller ("Koller," and, together with Steidinger, "Plaintiffs") hereby oppose Defendant Blackstone Medical Services, LLC's ("Defendant" or "BMS") Motion to Dismiss the First Amended Complaint and to Strike Demand for Attorney's Fees ("Def. Mem. Dkt. No. 10").

## **INTRODUCTION**

This lawsuit concerns repeated telemarketing calls and text messages that Defendant placed to Plaintiffs' cellular telephones to sell home sleep tests to the Plaintiffs – over Plaintiffs' request for Defendant to stop. Plaintiffs are not current or former patients of the Defendant, Defendant has not performed any sleep exam or any other health-related services for Plaintiffs, and the messages are nothing more than an attempt by Defendants to market their business and solicit new customers. These calls were telemarketing calls, made without prior express consent, and continued despite Plaintiffs' numbers being registered on the National Do Not Call Registry ("NDNCR") and/or after Plaintiffs' told Defendant to quit calling and violate the Telephone

Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059(5).

Defendant does not deny it placed the calls, does not deny that Plaintiffs asked it to stop calling, and does not deny that it continued to call and send the text messages knowing the Plaintiffs instructed it to stop. Rather, to excuse its calls, Defendant argues the calls were not solicitations and, if they were solicitations, they were sent with prior express consent or they are exempt from the regulations governing solicitations as healthcare or emergency calls. Defendant is wrong and, for each of the following reasons, Defendant's Motion to Dismiss should be denied.[1]

## **BACKGROUND**

BMS is a Florida-based company that aggressively sells home sleep tests. (First Amended Complaint ("FAC"), Dkt. # 6, ¶ 2). It is a sales company, not a healthcare provider. *Id*. Its website identifies no physicians or other medical professional on its staff.[2] *Id.* Instead, BMS employs hundreds of people for positions such as "Inside Sales Professional" to contact people to sell home sleep tests.[3] *Id.*

As part of its telemarketing campaign, BMS repeatedly sends text messages and telephone calls to telephone numbers that have been placed on the NDNCR for at least 30 days and over the

---

[1] Plaintiffs withdraw the claim under the Telemarketing and Consumer Fraud and Abuse Prevention Act.

[2] *See* FAC ¶ 2 n.1 (citing https://www.blackstonemedicalservices.com/vick-tipnes/ (last visited Feb. 13, 2024); https://www.blackstonemedicalservices.com/about/ (last visited Feb. 13, 2024); https://www.blackstonemedicalservices.com/executives/ (last visited Feb. 13, 2024) (identifying executives as a business consultant, director of sales, general counsel, and HR manager))

[3] *Id.* (citing https://www.ziprecruiter.com/c/Blackstone-Medical-Services/Job/Inside-Sales-Representative/-in-Tampa,FL?jid=8653af6305b08a6d&utm_campaign=google_jobs_apply&utm_source=google_jobs_apply&utm_medium=organic (Blackstone's job posting seeks a "high energy Inside Sales Professional") (last visited Feb. 13, 2024)).

messaged party's objections in order to sell home sleep tests. *Id.* ¶ 3.

Steidinger registered his number ending in 6904 (the "6904 Number") on the NDNCR on April 18, 2018. *Id.* ¶ 36. After discussing potentially taking a home sleep test with his own healthcare provider, Steidinger began receiving telephone calls and text messages from BMS. *Id.* ¶ 38. BMS is not Steidinger's health care provider and has never rendered any healthcare service to Steidinger. *Id.* ¶ 46.

During his one live call with BMS, the BMS representative told Steidinger that he could get a home sleep test for $100. *Id.* Steidinger said he was not interested. *Id.* Regardless, BMS continued to send Steidinger sales text messages to the 6904 Number:





Text Message
Fri, Nov 3 at 3:46 PM

Hi, we still got your prescription for the sleep apnea test. We have made several attempts to get a hold of you to set it up. Please call back at 813-708-7651to schedule. Best regards!

Text Message
Mon, Nov 27 at 2:05 PM

Good afternoon! This is a message from Blackstone Medical. We would like to inform you that your referral has been in our system for more than 6 months. We are reaching out to find out if you wish to proceed with your prescription or if you have any other concerns. You can call us at (813) 819-2100 or reply to this message. Thank you!

Mon, Nov 27 at 4:19 PM

STOP

+1 (813) 596-5847 ›

Text Message
Wed, Dec 6 at 1:20 PM

Hello, this is Yohany from Blackstone Medical Services. We've tried calling you several times, left you voicemails regarding your Home Sleep Test, and haven't heard anything from you... What should we do?

The sender is not in your contact list.
**Report Junk**



+1 (813) 596-9829 ›

Text Message
Tue, Dec 19 at 3:40 PM

Hi, it's Daniel from Blackstone Medical Services. Are you available for a quick call to finish the scheduling of the home sleep test that your doctor ordered for you? My number is (813) 825-1200

Wed, Dec 20 at 3:20 PM

**BLACKSTONE**
MEDICAL SERVICES

Hi, it's Daniel from Blackstone Medical Services. Do you want to move forward with the home sleep test ordered by your doctor? My number is (813) 825-1200

*Id*. ¶¶ 38-39.  As seen in the foregoing, Steidinger messaged Defendant "STOP" and "Stop", including on October 2, 2023, and November 27, 2023, to get BMS to stop contacting him. *Id*.  However, BMS ignored Steidinger's requests and continued to send him messages to sell him a home sleep test. *Id.*

Further, even though BMS had the ability to program its telephone dialing systems to honor "STOP" requests immediately, BMS instead deliberately programmed its telephone dialing systems to ignore such requests and continue sending telemarketing messages to consumers for months after receiving a "Stop" request. *Id*. ¶ 44.  And none of Defendant's messages to Plaintiff Steidinger's were for an emergency purpose, they were for sales. *Id*. ¶ 45

Koller's situation is largely similar.  Her cellular telephone number ends in 8855 (the "8855 Number"). *Id*. ¶ 48.  Upon information and belief, BMS obtained Koller's phone number from her doctor. *Id*. ¶ 51.  Koller did not give her physician permission to convey to BMS that Koller consented to any calls. *Id*. ¶ 52. All of the text messages BMS set to Koller were for the purpose of soliciting the sale of BMS' sleep study (*id*. ¶ 53).

On more than one occasion, the first of which was on or around July 27, 2023, Plaintiff Koller asked Blackstone to stop texting her, but Blackstone continued to send text messages to Plaintiff, the latest of which (as of this writing) was on January 26, 2024. A sampling of the text messages received by Plaintiff Koller can be seen in the following screenshots:





*Id.* ¶ 58. Like Steidinger, Koller repeatedly messaged BMS a stop directive, but BMS continued to send messages seeking to sell a home sleep test. *Id.* ¶ 58. Koller has replied "stop" to BMS text messages no less than 8 times, yet BMS continued to send telemarketing messages. *Id.* ¶ 62.

When texting "stop" did not work, on November 15, 2023, Koller called BMS and

informed Blackstone's representative that she had no interest in Blackstone's services and to stop contacting her. *Id.* ¶ 63. During the November 15, 2023 call, BMS' representative confirmed they had previously received Plaintiff Koller's do-not-call requests, and agreed to add Koller to BMS' internal do-not-call list. *Id.* ¶ 64. Nevertheless, BMS continued to send messages. *See, e.g.*, January 26, 2024, message *supra*, FAC ¶ 58.

Plaintiffs are not alone in their experiences, and internet message boards are replete with consumer complaints about BMS' telemarketing strategies (FAC ¶ 69[4]):



**Christina W**
★☆☆☆☆                                    09/15/2023

I've been harassed by this company for almost a year now. After deciding not to proceed with a sleep study, the company continued to call me and text me hundreds of time each day, literally every few minutes for months, even after stating that I did not want to proceed. After blocking 10+ phone numbers, the calls finally stopped for a couple months before picking back up from new numbers.



**Sarah R**
★☆☆☆☆                                    09/22/2023

Juan harasses you and sends texts alert daily multiple times a day about scheduling a service when I've already told them over 20 times I'm not interested.



**Brittany W**
★☆☆☆☆                                    10/27/2023

They dont take my insurance and they still keep calling and texting from different numbers (I respond stop to the text and then block the number) trying to get me to pay for the sleep study out of pocket. I have told them verbally over the phone that I am not interested and to remove my number from their list, then they started calling me about another patient. This company seems like a scam

---

[4] *Citing https*://www.bbb.org/us/fl/tampa/profile/sleep-apnea/blackstone-medical-services-llc-0653-90130035/customer-reviews (Last Visited: Feb. 9, 2024).



### Jayne H



12/07/2023

This company will text and call you nonstop and wont stop for anything to get you to schedule a sleep test. Ive blocked 10 different numbers and they keep finding me. I was actually planning to do the test until they called me 19 times in one day. I would never ever give my business to a company that behaves this way.



### Jesus D



12/27/2023

This company is a nightmare. My doctor made the mistake of sending a sleep study prescription to them right before I went on vacation. I talked to them and explained I will do it when I come back. They have sent me literally hundreds of text messages, and dozens of phone calls, sometimes impersonating the doctor ****** and asking me to do the study before I come back. I was thousands of miles away, and on vacation. I blocked their phone number many times, but they are a very sneaky company changing the caller ID every time they text or call. All this prompted me to check the reviews online. Holy macro! Needless to say, I will never work with these clowns.



### Alvin H



01/17/2024

This company wont stop harassing me. After I told them I didnt feel comfortable giving them my credit card number and paying for services I had not yet gotten they got rude. I told them I would needed to do more investigation and found out they have been doing this to serveral people. I told them I was no longer intrested in moving forward with them and to stop calling and text. Since than I get atleast 2 message a day and I have told them everytime I am not intrested but they will not stop



Natoshia T

01/19/2024

My dr put in a sleep study for me and I was told I would be hearing from Blackstone. The next day I received a text asking me to call. Then a few hours later received another text saying they had been trying to call me and had been leaving messages but I never had any. I call them and they tell me its covered by my insurance but I have to pay $250. I tell them I dont have the money and will wait for the test. They noted the account. Next day, text messages start again to have me call them to set up my study. I call again and tell them no. Next day comes and they text again, I ignore it. They call me and I tell them again Im waiting. She notes the account. 1 hour later I receive two more text messages from them. So I called and asked to speak to a supervisor and was transferred with no answer. Went back to the same guy and he transferred me again. This time the guy who answered told me that it doesnt work like that when I asked to speak to a supervisor. So I decided to yell at him. He pulls my account up and he says yeah it says youre not interested in the test so I ask why I am being called and texted and he said it was a problem in their end and he promised it wont happen again. Would never do business with a company like this.

## ARGUMENT

**A. The FAC plausibly alleges the calls and text messages were initiated for the purpose of encouraging Plaintiffs to purchase goods or services.**

Defendant's calls and text messages encouraged Plaintiffs and the putative class members to buy home sleep tests from Defendant and thus were "telemarketing" and "telephone solicitation calls" under the TCPA and FTSA. *See* 47 C.F.R. §§ 64.1200(f)(13), (f)(15); Fla. Stat. § 501.059(1)(j).

Telemarketing and telephone solicitations both are defined as calls made for the "purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13) & (15). Whether a message constitutes telemarketing depends on its purpose. *Sullivan v. All Web Leads, Inc.,* 2017 WL 2378079, at *6 (N.D. Ill. June 1, 2017). Moreover, "[t]he Court must also approach the purpose of the message 'with a measure of common sense.'" *Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040, at *2 (D. Ariz. Jan. 12, 2023) (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th

Cir. 2012)). To that end, "it is the purpose behind a call that controls, not what happened during the call." *Bennett v. GoDaddy.com LLC*, 2019 WL 1552911, at *8 (D. Ariz. Apr. 8, 2019).

As set forth in the FAC and above, Defendant is "sales company, not a healthcare provider"; it has no medical professionals on its staff and instead employs "Inside Sales Professional" employees to "sell home sleep tests." FAC ¶ 2. Defendant's calls and messages specifically encouraged the purchase of Defendant's services, i.e., sleep studies, provided Defendant's telephone number and demanded that recipients call the Defendant, and discussed how the recipient could purchase the services (calling Defendant to schedule the sleep study). *Id.* ¶¶ 38-39, 53-55, 58. For instance, during one of the calls to Plaintiff Steidinger Defendant tried to sell him a home sleep test for $100 but he declined. *Id.* 38. Further, Plaintiffs allege Defendant engages in an aggressive practice of calling Plaintiffs and class members over their repeated objections and requests for Defendant to stop. *Id.* ¶¶ 38-41, 58-65. Approaching these allegations with a "measure of common sense," Plaintiffs plausibly allege Defendant's calls are telemarketing and telephone solicitations.

The Court should reject Defendant's argument that "[w]hen a plaintiff is not required to pay for goods or services offered in a telephone communication, the communication is not for the purpose of encouraging the purchase of those goods or services." Def. Mem. at p. 1. First, it is inapplicable here where Plaintiffs allege that Defendant in fact demanded that the called parties pay it money for sleep tests like they did when they told Plaintiff Steidinger to pay $100. Second, even if the called parties agreed to the sleep tests (they did not) and their insurance companies subsequently paid for or reimbursed the called parties in whole or in part for the costs of the tests (they did not), Defendant's calls and messages are still telemarketing and telephone solicitations because they were part of Defendant's "larger marketing, or profit-seeking, scheme and, as such,

fall within the TCPA's prohibition." *Fiorarancio v. WellCare Health Plans, Inc.*, 2022 WL 111062, at \*3 (D.N.J. Jan. 11, 2022); *see Less v. Quest Diagnostics Inc.*, 515 F. Supp. 3d 715, 717 (N.D. Ohio 2021) ("Courts may look beyond the pretextual claim that a service is 'free' when determining whether it is a solicitation under the TCPA.").

In *Fiorarancio*, the "Defendant's calls consistently referenced free services" and "each of the messages Defendant left for Plaintiff included a number for Plaintiff to call in order to obtain more information about, or take advantage of, the offer for free services." *Fiorarancio,* 2022 WL 111062, at \*3. However, the Court explained that "[a]lthough the TCPA does not explicitly include free services or programs in the definition of 'telephone solicitations,' '[w]e know from common experience ... that 'free offers' often come with strings attached.'" *Id.* (citing *Physicians Healthsource, Inc. v. Stryker Sales Corp.,* 65 F. Supp. 3d 482, 493 (W.D. Mich. 2014)). Indeed, in that case to "claim the free services, Plaintiff would have had to speak to one of Defendant's agents where he might have been exposed to further solicitations or advertisements." *Id.* "Thus, while Defendant's messages may have been informational on their face, it is plausible that they were part of a larger marketing, or profit-seeking, scheme and, as such, fall within the TCPA's prohibition." *Id.*; *see also, e.g., Whittaker*, 2023 WL 167040 at \*2 ("Except for encouraging the purchase of its products, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money, as did the recorded message in this case."); *Abboud v. Circle K Stores Inc.*, 2024 WL 1765659, at \*5 (D. Ariz. Apr. 24, 2024) ("Although the messages did not expressly seek to induce Plaintiff to purchase a particular product, it is difficult to imagine why Defendant would repeatedly encourage her to sign up for offers other than to encourage her to make future purchases of goods at Defendant's stores based on those offers.").

Further, Defendant's practice of sending dozens of text messages and calls to Plaintiffs over the course of several months after they asked it to stop contacting them (FAC¶¶ 38-41, 58-65) "makes it more likely the calls were part of an overall marketing scheme—*businesses typically do not promote free services in such an aggressive manner without any business purpose*." *Fiorarancio,* 2022 WL 111062, at *3 (emphasis supplied). Here, common sense shows that Defendant's aggressive calling practices were part of its for-profit business model where it makes more money by selling more sleep tests.

Defendant's reliance on *Hulce v. Zipongo*, which is currently on appeal, is misplaced. *See* Def. Mem. at p. 3. First, in *Hulce* "plaintiff concede[d] that the purpose of the calls was not to encourage him to purchase [defendant's] services, since the services were available to him for free." 2024 WL 1251108, at *3 (E.D. Wis. Mar. 18, 2024). Here, by contrast, Plaintiffs allege that Defendant demanded Steidinger pay money.

Second, in *Hulce* "[a]t the time of the communications, [an insurance company] had already agreed to pay [the defendant] for any services provided to its members, so [the insurer company] needed no further encouragement to do so." *Id.*, at *4. "The calls did not . . . ask plaintiff to encourage [the insurer] to add [defendant's] services to his health plan." *Id.* As a result, the Court held that "[w]hile [the insurer] paying [the defendant] to provide services to its members might reasonably be characterized as a 'purchase' of those services on behalf of its members," based on the facts in that case "the purpose of the communications could not have been to *encourage* [the insurer] to make that purchase." *Id.* Here, by contrast, there are no allegations in the FAC from which the Court could reasonably infer that at the time Defendant called and messaged Plaintiffs there were preexisting contracts between Defendant and Plaintiffs' insurance companies to provide "free" sleep studies to Plaintiffs, or that Plaintiffs' insurance companies

otherwise agreed to pay for the sleep studies. Defendant itself claims the calls were made pursuant to orders by Plaintiffs' doctors, not Plaintiffs' insurance companies. *See* Def. Mem. at p. 4. None of the text messages quoted in the FAC state that Defendant's sleep study is a free benefit of the Plaintiffs' insurance; as noted, during one call Plaintiff Steidinger was told he had to pay for the sleep test. *See* FAC ¶¶ 4, 38, 39, 58. The FAC is completely silent about Plaintiffs' insurance companies (because Plaintiffs never proceeded with any sleep tests). Even if Plaintiffs' insurance companies were relevant to the analysis (they are not), in *Hulce* the court did "not address whether, in a transaction for a service covered by health insurance, the insured could be considered a purchaser for purposes of the TCPA" – the exact proposition Defendant cites it for here. *Hulce*, 2024 WL 1251108, at *3 n. 1.

For the foregoing reasons, Plaintiffs have sufficiently alleged that the calls and texts were for the purpose of encouraging Plaintiffs to purchase Defendant's sleep studies and thus have alleged the calls and text messages were "telephone solicitations" and "telemarketing."[5]

**B. The FAC is not an impermissible "shotgun" pleading.**

"[T]he mere fact that a complaint's counts incorporate by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them." *United States Sec. & Exch. Comm'n v. Winemaster,* 529 F. Supp. 3d 880, 907 (N.D. Ill. 2021). Dismissal under Rules 8(a)(2) and 10(b) is only appropriate where "it is virtually impossible to know which allegations

---

[5] At a minimum, discovery is required before the Court can resolve the issue. *See Less*, 515 F. Supp. 3d at 717–18 (denying motion to dismiss where "[m]ore information is needed to determine whether the calls in this case were solicitations under the statute. Questions remain, such as -- What was the business strategy behind Quest/MedXM making the calls? How did the calls generate revenue for Quest/MedXM? Were the call operators paid on a commission or incentivized if recipients booked an appointment?").

of fact are intended to support which claim(s) for relief." *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1325-26 (11th Cir. 2015).

Rule 10(b) only requires that claims found on a separate transaction or occurrence be stated in a separate count, if it would promote clarity. Here, Plaintiffs have pled a single set of facts that support causes of action under separate statutes and regulations that have similar elements. Nearly every fact pled is relevant to each count. Further, each count clearly sets out which specific alleged facts support the cause of action, allowing Defendant to easily know which of the incorporated alleged facts are relevant to the claim. Indeed, Defendant was able to move to dismiss raising multiple independent (but baseless) grounds for dismissal as to each of Plaintiffs' claims. *See* Def. Mem. Accordingly, the format of the FAC "does not prevent the Court from reviewing the sufficiency of each count" and should not be dismissed for "shotgun pleading." *Winemaster,* 529 F. Supp. 3d 880, 907.

### C. The calls and texts were not sent with prior express consent and continued even after any consent that Plaintiffs may have given was revoked.

"The prevailing view in this district is that 'prior express consent' under the TCPA 'is an affirmative defense on which the defendant bears the burden of proof; it is not a required element of the plaintiff's claim.'" *Kolinek v. Walgreen Co.*, 2014 WL 518174, at *2 (N.D. Ill. Feb. 10, 2014) (collecting cases); *see Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1126 (7th Cir. 2023). For this reason, courts reject a TCPA defendant's attempt on a Rule 12(b)(6) motion to argue consent contrary to express allegations in a complaint or attack a complaint for not pleading lack of consent. *See, e.g., Charvat v. Allstate Corp.*, 29 F.Supp.3d 1147, 1149 (N.D. Ill. 2014); *Thrasher–Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 905 (N.D. Ill. 2012);

*Greene v. DirecTV, Inc.*, 2010 WL 1506730, at *2 (N.D. Ill. Apr. 14, 2010).[6]  So too, here the FAC is not subject to dismissal based on Defendant's consent arguments.

First, for Plaintiff Steidinger's claims based on the DNC Registry regulations, prior express *written* consent is required to place telephone solicitation calls. 47 C.F.R. § 64.1200(c)(2)(ii) (consent must be "evidenced by a signed, written agreement between the consumer and the seller which states the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed.").[7] Defendant does not claim it had prior express written consent or point to any allegations in the FAC that Plaintiff Steidinger gave his prior express written consent to receive Defendant's solicitation calls.

Second, for the Plaintiffs' claims based on the Internal DNC regulations, there is no exemption for prior express consent. *See Hossfeld v. Allstate Ins. Co.*, 2024 WL 1328651, at *10 (N.D. Ill. Mar. 28, 2024) ("The internal do-not-call regulations contain no comparable exception.").  While some courts have found otherwise, *id.,* at *11 (noting a split amongst district courts), here Defendant has not shown that prior express consent "is set out entirely in the plaintiff's complaint." *Charvat*, 29 F. Supp. 3d at 1149 (internal citation omitted).  Indeed, Defendant notes Plaintiffs spoke with their physicians about sleep tests but concedes that "Plaintiffs do not allege specifically that they gave their phone numbers to their doctors," Def. Mem. at p. 7. Defendant's

---

[6] Accordingly, Defendant's reliance on summary judgment decisions addressing prior express consent is misplaced *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) (appeal from summary judgment ruling; *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016) (same); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050 (N.D. Ill. 2016) (summary judgment ruling).

[7] Conveniently, when stating the consent required to place calls to numbers on the DNC Registry, Defendant did not cite to the DNC regulations themselves found at 47 C.F.R. § 64.1200(c)(2)(ii) and instead cited to the general definition found at 64.1200(f)(15) of "telephone solicitation," which excludes call or messages "to any person with that person's prior express invitation or permission." *See* Def. Mem. at 6.

"unsupported speculation that plaintiff *might* have provided prior express consent" to its physician is insufficient. *Charvat*, 29 F. Supp. 3d at 1149.

Third, even if Plaintiffs did initially consent to the calls and messages (they did not), they each repeatedly revoked their consent by asking Defendant to stop contacting them yet Defendant continued to message and call them. *See* FAC ¶¶ 40-43, 58-62. *See Chatman v. MiraMed Revenue Grp., LLC*, 2022 WL 832642, at *5 (N.D. Ill. Mar. 21, 2022) ("courts in this district and nationally have continued to affirm party's right to revoke consent"); *Gager v. Dell Fin. Servs., LLC.*, 727 F.3d 265 (3d Cir. 2013) (holding prior express consent under TCPA can be revoked at any time); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014) (holding in the absence of contractual restrictions to the contrary consent can be orally revoked). Thus, at a bare minimum Defendant lacked prior express consent for all calls placed after Plaintiffs' first requests for Defendant to stop calling them.

**D. Plaintiff's' Opt-Out Claims and Internal DNC Claims (Counts I, II, & IV) do not require Plaintiffs to allege Defendant used an automatic telephone dialing system or an "artificial or prerecorded voice."**

The Court should reject Defendant's incorrect argument that "[f]or messages to be subject to the Opt-Out regulation or the Internal DNC regulation, they must be made using an 'automatic telephone dialing system' ('ATDS') or an 'artificial or prerecorded voice.'" *See* Def. Mem. at p.8. Defendant relies upon 47 U.S.C. § 227(b)(1)(A)–(B), which is titled, "Restrictions on use of automated telephone equipment," and cases determining claims brought under that section, but Plaintiffs' TCPA claims are not based on that portion of the TCPA and are instead brought pursuant to 47 U.S.C. § 227(c), which is titled, "Protection of subscriber privacy rights." FAC ¶¶ 33, 34, 96, 101, 102, 109, 119, 123, 131.

The relevant regulations do not require Plaintiffs to plead the use of an ATDS or prerecorded or artificial voice. For instance, the Internal DNC regulation specifically states in its entirety:

> (d) No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section *or* **any call for telemarketing purposes to a residential telephone subscribe**r unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200 (emphasis added). Accordingly, to state a claim for violations of the Internal Do Not Call regulations, Plaintiffs do not need allege Defendant used an artificial or prerecorded voice.

Likewise, the Opt-Out violations brought in Count IV of the FAC require "an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request" "[i]n every case where the artificial or prerecorded-voice telephone message is made pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section *or* **includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section."** 47 C.F.R. § 64.1200(b)(3) (emphasis supplied). That regulation also applies to text message as well. *Liotta v. Wolford Boutiques, LLC*, 2017 WL 1178083, at *4 (N.D. Ga. Mar. 30, 2017) ("Defendant's failure to include an opt-out mechanism with its text messages, resulted in the precise harm the TCPA provisions aimed to prevent, namely the nuisance and invasion of privacy that result from unwanted text messages.")

In short, the plain language of the relevant regulations show that Plaintiffs need not allege ATDS use or prerecorded or artificial voices to state claims for relief.

**E. The calls and texts are telemarketing calls that are not expressly excluded from the TCPA.**

    **a. Health care messages are not exempt from the Internal DNC or Opt-Out Regulations**

Defendant incorrectly states that health care messages are exempt from the Internal DNC and Opt Out regulations. *See* Def. Mem. at p. 11. Specifically, Defendant claims that sections 64.1200(b) and 64.1200(d) incorporate the health care message exemption found at sections 64.1200(a)(3)(v) (the "Health Care Rule"). *Id.*[8] In fact, the plain language of the regulations make it clear the Internal DNC and Opt-Out regulations apply to health care messages, and that Defendant cannot take advantage of the Health Care Rule because it does not honor stop requests and thus had no prior express consent to place the calls. *See Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343, 1348 (N.D. Ga. 2018) ("Most of the cited authority concludes that the Health Care Rule still requires prior express consent based on the FCC's own interpretation of the Health Care Rule.").

First, the Health Care Rule itself only applies where the caller "honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section." 47 C.F.R. § 64.1200(a)(3)(v). As alleged in the FAC, Defendant did not honor Plaintiffs' requests to opt out of future calls and thus cannot take advantage of the Health Care Rule.

Second, the Opt Out and Internal DNC regulations reiterate that to qualify for the Health Care Rule, the caller must honor the opt out requests. The Opt Out regulation's requirement that calls and messages provide an opt-out mechanism state on their face that they apply to calls "made pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section." 47 C.F.R. §

---

[8] Plaintiffs also bring TCPA claims under 47 C.F.R. § 64.1200(c)(2) for calls to numbers on the National Do Not Call list, but Defendant does not claim those calls are subject to the Health Care Rule. *See* Def. Mem. at pp. 11-12.

64.1200(b)(3). Likewise, the Internal DNC regulation's requirement that callers maintain do-not-call lists applies to calls made "pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section . . . ." 47 C.F.R. §64.1200(d)(6). Given that Plaintiffs' claims are based on Defendant's failure to honor do-not-call requests and its failure to maintain an internal do not call list, it cannot take advantage of the Health Care Rule.

**b. Defendant's calls and messages are not health care messages.**

Even if health care messages were exempt from the Opt-Out and Internal Do Not Call regulations, Defendant's calls and messages here do not qualify as health care messages under the Health Care Rule.

To determine whether a call is covered by the Health Care Rule, courts consider (1) "whether the call 'concerns a product or service that is inarguably health-related'"; (2) "whether the call 'was made by or on behalf of a health care provider to a patient with whom she has an *established health care treatment* relationship'"; and (3) "whether the call 'concerns the *individual health care needs* of the patient recipient.'" *Murtoff v. My Eye Dr., LLC*, 2022 WL 889004, at *3 (N.D. Ill. Mar. 26, 2022) (citing *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 851 (S.D.N.Y. 2017)) (denying motion to dismiss).

In *Murtoff*, the Court held at the motion to dismiss stage that the Health Care Rule did not apply to calls that were inarguably health-related, because (1) there was no established health-care treatment relationship given that defendant did not render any health care to the plaintiff (instead the defendant only received an inquiry from the plaintiff about the cost of a pair of eyeglasses); and (2) the calls did not pertain to the individual health care needs of the patient given that "there was nothing individualized about" defendant's calls which stated "according to our records, it's time for your next eye exam." *Murtoff*, 2022 WL 889004, at *5-6 (N.D. Ill. Mar. 26, 2022).

The *Murtoff* court distinguished other cases applying the Health Care Rule because they involved "a relationship that went beyond what is alleged to have existed" in *Murtoff* and in this case; the defendants in those cases had previously provided flu shots to the called party or the plaintiff had previously purchased health care services from the defendant. *Murtoff*, 2022 WL 889004, at *4-5 (citing *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 840 (S.D.N.Y. 2017); *Jackson v. Safeway, Inc.*, 2016 WL 5907917, at *1 (N.D. Cal. Oct. 11, 2016); *Forney v. Grand Island Chiropractic, P.C.*, 2019 WL 8063922, at *1 (W.D.N.Y. Nov. 8, 2019)). Here, the cases cited by the Defendant are likewise distinguishable because they involved a healthcare provider who itself had a preexisting patient relationship with the intended called party. *See Gugliemlo v. CVS Pharm., Inc.*, 2021 WL 3291532, at *2 (D. Conn. Aug. 2, 2021) (plaintiff received notifications for prescription pick-ups for his father's prescriptions); *Latner v. Mount Sinai Health Sys.*, 2016 WL 10571897, at *3 (S.D.N.Y Dec. 14, 2016) (flu shot reminders to former patients of the calling party are health care messages).

In *Sullivan v. All Web Leads, Inc.,* the plaintiff entered their personal information on a website in order "to obtain quotes on health insurance plans," the plaintiff thereafter began receiving calls from health insurance agents attempting to persuade him to enroll in a health insurance plan, the plaintiff did not enroll in any insurance plans with the defendant but continued to receive additional calls over the following days. *Sullivan v. All Web Leads, Inc.*, 2017 WL 2378079, at *1 (N.D. Ill. June 1, 2017). In finding that the Health Care exception was inapplicable to the calls at issue, the Court found, *inter alia,* that the defendant did "not autodial consumers 'by or on behalf of a health care provider' in the course of an 'established health care treatment relationship'" given that the defendant's calls "neither remind patients who had a flu shot last year to come into the same pharmacy to receive this year's flu shot, nor confirm provision of medication

to an individual 'in accordance with a prescription'" and "[i]nstead, All Web's calls represent *an effort to inaugurate a new relationship*" between the Parties. *Id.*, 2017 WL 2378079, at *5 (emphasis supplied).

Here, Plaintiffs are not a former or current patient of the Defendant, Defendant does not claim that it ever provided Plaintiffs with any sleep tests or other medical treatment or services, and therefore, as in *Murtoff* and *Sullivan*, there is no established health care treatment relationship between the parties; the calls were merely an effort to inaugurate a new relationship (that was never formed). This is distinct from cases finding the Health Care exception applicable, such as *Zani* and *Jackson,* where the calls were only placed to existing patients of the defendants who, for example, had previously gotten a flu shot from the caller. Moreover, the fact that the Plaintiffs may have a health care treatment relationship with their separate (non-party) health care providers, who may have ordered a sleep test, does not change the fact that there is no such relationship between Plaintiffs and Defendant. Plaintiffs' actions confirm this; when the Defendant contacted them they specifically told the Defendant to *stop* calling them.

In addition, Defendant's messages and calls did not pertain to the individual health care needs of the plaintiffs. The messages set forth in the FAC generically referenced a sleep test or sleep apnea test and repeatedly asked the called/messaged party to call the Defendant. There was no tailoring to the individual needs of the Plaintiffs; the text messages did not even mention Plaintiffs by name and appear to be identical to messages sent to other consumers.

Further, the fact that Defendant's messages are tangentially health-related in that they ask Plaintiffs to schedule a sleep apnea test, is not dispositive. As noted above, courts have recognized that in some cases although messages are "purportedly delivering a health care message," they are "so laden with marketing material as to raise a factual issue as to whether they fall outside the

health care exemption." *Zani v. Rite Aid Hdqtrs. Corp.*, 725 F. App'x 41, 44 (2d Cir. 2018). That is the case here. The apparent purpose of the calls was to solicit new business and market their services rather than 'deliver a health care message.' *See* FAC ¶ 2; *Dorfman v. Albertsons, LLC*, 2019 WL 5873448, at \*3 (D. Idaho Feb. 12, 2019) ("a prescription-related call might be so dominated by marketing material its purpose is to solicit the purchase of goods, property, and service") (citing *Zani*, 725 F. App'x at 44). That Defendant was merely trying to solicit new business is further evidenced by the fact that (1) Defendant placed the messages to Plaintiffs repeatedly over the course of multiple months, FAC ¶ 39, 41 (alleging calls to Plaintiff Steidinger from at least October 2, 2023 and continuing until a at least January 2024) and FAC ¶ 58 (alleging calls to Plaintiff Koller from July 27, 2023 and continuing until at least January 26, 2024); *see also Forney*, 2019 WL 8063922, at \*4 n.4 ("Defendants here allegedly sent Plaintiff numerous messages over several months.") and (2) Plaintiffs repeatedly asked Defendant to stop placing the calls to the but Defendant ignored the request and continued to inundate Plaintiffs with the same telemarketing messages FAC ¶¶ 40,41, 58, 62.

Defendant has failed to establish that their telemarketing telephone calls to Plaintiffs to solicit new business from them fall within the Health Care exception and the Court should deny Defendant's Motion to Dismiss Counts I, II, & IV on this basis.

**b. The messages do not fall within "emergency purposes."**

Defendant's calls and messages to Plaintiffs were not for an emergency. *See* Def. Mem. at p. 12. Defendant claims that its calls were "prescription update notifications" and therefore automatically for an emergency purpose. *Id.* Perhaps in some situations a reminder call for a

someone's actual medication may be considered an emergency,[9] but not Defendant's calls to try to sell sleep tests which Plaintiffs were not interested in.  Nor is there a categorical rule that all prescription calls fall within the emergency purpose exemption. *See Kolinek v. Walgreen Co.*, 2014 WL 12772279, at *1 (N.D. Ill. Aug. 11, 2014) (the FCC has not "read the exception as covering any call to a customer about prescriptions, prescription refills, or anything of the sort").

Even if the emergency exemption is initially met (it is not here), the exemption is not applicable once the called party makes it clear they do not want or need the calls as Plaintiffs did here when they repeatedly asked Defendant to stop calling them.  *See Coleman v. Rite Aid of Ga., Inc.*, 284 F. Supp. 3d 1343, 1346-47 (N.D. Ga. 2018) ("the emergency purposes exception to the TCPA does not apply to calls made after Coleman told Rite Aid to stop calling him."); *St. Clair v. CVS Pharm., Inc.*, 222 F.Supp.3d 779, 780-81 (N.D. Cal. 2016) (continuing to call about a prescription "when the customer has made clear that he does not want or need the calls, does not fall within the definition of an 'emergency purpose'"); *Laccinole v. Appriss, Inc.*, 453 F.Supp.3d 499, 504 n.4 (D.R.I. 2020) ("The emergency exception does not apply where an entity calls an individual who has previously asked not to be contacted.").  Here, Plaintiffs alleged they repeatedly told Defendant that they were not interested in the home sleep tests offered by Defendant and told Defendant to quit calling them.  FAC ¶¶ 38, 63. Therefore, the calls were not for emergency purposes. Defendant has failed to establish that their telemarketing telephone calls to Plaintiffs to

_____

[9] For instance, Defendant relies upon *Roberts v. Medco Health Sols.*, but that case involved calls from pharmacy benefit managers that were intended for family members who were "receiving one or more prescription medications from defendants that would have been important to their continued health"; the "Husband indicated that the medicine Son was taking was 'a must' and without it, Son could end up in the hospital." *Roberts v. Medco Health Sols., Inc.*, 2016 WL 3997071, at *2 (E.D. Mo. July 26, 2016) ("The representative made a note in Son's file that an update in Son's insurance was needed immediately because he was "very, very desperate for very expensive medication.").  There is no comparison to be drawn here.

them fall within the Emergency exception and the Court should deny Defendant's Motion to Dismiss Counts I, II, & IV on this basis.

**F. Plaintiff Koller plausibly alleges he is a consumer under the FTSA.**

The FSTA defines consumer goods or services as meaning "real property or tangible or intangible personal property that is normally used for personal, family, or household purposes, including, but not limited to, any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed, as well as cemetery lots and timeshare estates, and any services related to such property." Fla. Stat. § 501.059(1)(c). It defines "Consumer" as meaning "an actual or prospective purchaser, lessee, or recipient of consumer goods or services." Fla. Stat. § 501.059(1)(b).

Plaintiff Koller alleges that Defendant placed calls and sent text messages to her to sell a home sleep test, and that home sleep tests are consumer goods or services. FAC ¶ 53. Accordingly, Plaintiff Koller has sufficiently alleged she is a consumer under the FSTA.

**G. The Court should not strike Plaintiffs' demand for attorney's fees under the TCPA**

Attorney's fees are recoverable in TCPA class actions and therefore the motion to strike should be denied. Under Rule 23(h) "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Courts routinely award such fees in TCPA class action settlements." *Craftwood II, Inc. v. Wurth Louis & Co.*, 2017 WL 4286605, at *9 (C.D. Cal. Sept. 20, 2017) (collecting cases). Accordingly, "the attorney's fee demand in Plaintiff's Complaint is by no means 'redundant, immaterial, impertinent, or scandalous matter,'" and the Court should not strike the request for attorney's fees. *Id.* (citing Fed. R. Civ. P. 12(f)(2)); *see also Burke v. Credit One Bank, N.A.*, 2019 WL 1468536, at *5 (M.D. Fla. Feb. 5, 2019) (declining to strike request for attorney's

fees in TCPA class complaint where "the parties remain at the early stages of litigation—namely, they have yet to conduct discovery and Plaintiff has not moved for class certification . . . The mere request for attorney's fees and litigation costs in the Complaint relates to the controversy, does not confuse the issues, and does not prejudice Defendants.").

Dated: May 24, 2024

Respectfully submitted,

By   */s/ Sergei Lemberg*
      Sergei Lemberg
      LEMBERG LAW, L.L.C.
      43 Danbury Road, 3rd Floor
      Wilton, CT 06897
      Telephone: (203) 653-2250
      Facsimile:  (203) 653-3424
      *Attorneys for Plaintiffs*

## <u>CERTIFICATE OFCOMPLIANCE WITH WORD COUNT</u>

I hereby certify that, pursuant to Local Rule 7.1(B)(4)(b)(1), the foregoing brief contains 6484 words.  I calculated the word count by relying upon the word count of the word processing system used to prepare the document.

By   */s/ Sergei Lemberg*
      Sergei Lemberg

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2024, a true and correct copy of the foregoing was filed with the Clerk of the Court through the ECF system which gave notice of such filing to all parties of record.

*/s/ Sergei Lemberg*
Sergei Lemberg
